AHM/GAM   Feb. 2005
GJ #6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# <u>SOUTHERN DIVISION</u>

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) **Case No.:** |
| v. | ) |
| | ) **Violations:** |
| | ) 18 U.S.C. § 371 – Conspiracy; |
| | ) 18 U.S.C. § 1001 - False Statements; |
| **JAMES P. BENNETT,** | ) 18 U.S.C. § 1957 – Money Laundering; |
|     Defendant. | ) 18 U.S.C. § 2 – Aiding & Abetting; |
| | ) 15 U.S.C. §§ 78j(b) and 78ff;  17 C.F.R. |
| | )    § 240.10b-5 – Securities Fraud/Insider |
| | )    Trading; |
| | ) 15 U.S.C. §§ 78m(a), 78m(b)(2), and 78ff; |
| | ) 17 C.F.R. § 240.13b2.2 - False |
| | )    Statements to Auditors; |
| | ) 18 U.S.C. §§ 981 and 982 – Forfeiture |

# <u>INDICTMENT</u>

**THE GRAND JURY CHARGES:**

<u>COUNT 1</u>
<u>Conspiracy</u>
<u>Title 18, United States Code, Section 371</u>

    At all times material to this Indictment:

<u>INTRODUCTION</u>

    1.    HealthSouth Corporation (hereinafter "HealthSouth") was engaged in the business of providing various healthcare services to the public.  HealthSouth was organized as a corporation under the laws of the State of Delaware in 1984, and headquartered in Birmingham, Alabama.  By 2002, HealthSouth had grown to what was described as the nation's largest provider of outpatient surgery, diagnostic imaging, and rehabilitative healthcare services, with approximately 1,800 locations in all 50 states, Puerto Rico, the United Kingdom, Australia, and Canada.

2.     From 1991 through 2000, defendant **JAMES P. BENNETT** was an officer at HealthSouth and, in 1993, also became a member of the Board of Directors.  In 1995, defendant **JAMES P. BENNETT** became the President and Chief Operating Officer of HealthSouth and served in that capacity until his resignation.  As President and Chief Operating Officer, defendant **JAMES P. BENNETT** was responsible for the management of the operating divisions of HealthSouth; he reported directly to the Chief Executive Officer.  Defendant **JAMES P. BENNETT** received salaries, bonuses, stock options, and other benefits from HealthSouth.

<u>**Compensation of the Defendant**</u>

3.     From 1996 through 2000, defendant **JAMES P. BENNETT** received approximately $30.9 million in compensation from HealthSouth, including approximately $3 million in base salary, approximately $2.9 million in bonuses, and stock options valued at approximately $25 million when exercised.  Additionally, defendant **JAMES P. BENNETT** received valuable benefits including company loans and the use of automobiles.  Defendant **JAMES P. BENNETT** continued to receive his base salary of $650,000 for two years after his resignation from HealthSouth.

<u>**HealthSouth's Sale of Securities**</u>

4.     HealthSouth raised millions of dollars in a variety of ways, including issuing and selling shares of stock and bonds, which became available for trading on various public markets, and borrowing money from banks.  Stocks and bonds are known as "securities."

5.     Thousands of individuals from all over the United States and many institutions, mutual funds, insurance companies, retirement systems, and HealthSouth employees who were members of the HealthSouth Stock Purchase Plan purchased HealthSouth's securities.

<u>**Regulation of the Sale of Securities**</u>

6.     The United States Securities and Exchange Commission (the SEC), headquartered in Washington, D.C., is an agency within the executive branch of the government of the United States, and is responsible for enforcing federal securities laws.

7.     In order to sell securities to the public and to permit public trading of its securities, HealthSouth was required to register its securities with the SEC.  HealthSouth was also required to comply with certain laws and SEC regulations designed to protect the public and to ensure that

a company's financial information was accurately recorded and fairly disclosed. HealthSouth was further required to make and keep books, records, and accounts that accurately and fairly reflected its income, expenses, and assets and liabilities, and to devise and maintain a system of internal accounting controls which would reasonably assure that these objectives were satisfied.

8. HealthSouth was an issuer of a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and was required to and did file various periodic reports and other documents with the SEC, which included representations concerning its revenues, net income and losses, earnings, the value of its assets and the amount of its liabilities. These documents included:

    a. Forms S-3, S-4, and S-8 registration statements filed in connection with the registration of HealthSouth's stocks and bonds;

    b. Forms 8-K detailing material events;

    c. Forms 10-Q, which included the quarterly report of its financial condition and the results of its operations; and

    d. Forms 10-K, which included the annual report of its financial condition and the results of its operations.

9. HealthSouth filed its Forms 10-K, 10-Q, 8-K, S-3, S-4, and S-8 with the SEC in Washington, D.C. These documents were available for public review.

## Accounting Principles and Practices

10. Financial statements produced by HealthSouth included both an Income Statement and a Balance Sheet.

> <u>The Income Statements</u> reported, among other things, the company's revenue and expenses incurred during a stated period of time, usually a three-month period or quarter, or a twelve-month period or year. The company's earnings per share (EPS) was generally calculated by dividing its net income by the number of its outstanding shares of stock.

>The Balance Sheets reported, among other things, the value of the company's assets and amount of its liabilities at the end of a reporting period, usually the last day of a quarter or the last day of a year.

11. As is customary in the healthcare industry, HealthSouth billed "third party payors," such as insurance companies, Medicare, and Medicaid, for healthcare services at amounts greater than it expected to collect. The total amount billed was entered into gross revenue accounts. The amount HealthSouth did not expect to collect was entered into separate "contractual adjustment" accounts. The amount in the contractual adjustment accounts was subtracted from the amount in the gross revenue accounts to help calculate net income.

12. Ernst & Young LLP was the independent accounting firm retained by HealthSouth to audit HealthSouth's annual financial statements. As part of the audit process, the top-ranking corporate officers of HealthSouth made certain written representations to Ernst & Young concerning the accuracy of HealthSouth's books and records.

**Dissemination of Financial and Patient Statistical Information**

13. Income Statements and Balance Sheets, which reflected the results of its operations and financial condition, were included in and with various documents HealthSouth filed with the SEC. HealthSouth also distributed Income Statements, Balance Sheets, Patient Statistical Information, and other financial information reflecting income, expenses and assets to HealthSouth's Board of Directors, employees, stockholders and bondholders, potential stockholders and bondholders, bond underwriters, market analysts, bankers, the media, and other interested parties, by a variety of means including conference calls, media interviews, press releases, internet web sites, conventions, investor meetings, and corporate meetings.

14. The Board of Directors, employees, stockholders and bondholders, potential stockholders and bondholders, bond underwriters, market analysts, bankers, the media, and other interested parties relied on the information distributed by HealthSouth in making investments and other decisions.

15. HealthSouth at times also provided "guidance" to the investing public regarding its anticipated earnings and earnings per share. Relying in part on the company's "guidance," many professional securities analysts disseminated to their clients and the public their estimates

of the company's expected performance.  These estimates were often called "earnings estimates" or "analyst expectations."  These "earnings estimates" and "analyst expectations" were reviewed by many investors who relied on the information to make investment decisions.

### Internal Financial Reports

16.     The corporate accounting staff at the company's headquarters building in Birmingham, Alabama, maintained HealthSouth's corporate books and records, including its general ledger and supporting databases.  The staff used the general ledger and databases to capture the company's financial information.  The staff also used the general ledger and databases to generate internal monthly, quarterly, and annual reports which showed HealthSouth's current financial information, particularly its revenue, expenses, and net income and losses.  These reports were delivered to, reviewed by, and discussed with senior officers of HealthSouth.  Staff of the operating divisions of HealthSouth also generated periodic reports showing the results of operations, patient counts, cash collections, and other statistics which were provided to senior officers of HealthSouth.

17.     During the period from 1996 through at least 2000, these internal reports showed that HealthSouth often failed to produce sufficient net income to meet its quarterly and annual "guidance," the consensus of Wall Street analysts' estimates, and HealthSouth's internal budgets.  Senior officers of HealthSouth would refer to such failures as "not making the numbers," and they believed that revealing the company's actual performance and shortfalls to the investing public and analysts would adversely affect the market price of HealthSouth's stock.

### The Conspiracy

18.     From in or about 1996, the exact date being unknown to the Grand Jury, to in or about February 2003, within Jefferson County in the Northern District of Alabama, and elsewhere, defendant

### JAMES P. BENNETT

knowingly and willfully conspired with other persons, known and unknown to the Grand Jury,  to commit offenses against the United States, that is to:

(a) devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to execute and attempt to execute the scheme and artifice by placing and causing to be placed in a post office and an authorized depository for mail matter to be sent and to be delivered by the United States Postal Service, and to deposit and cause to be deposited matter to be sent and delivered by a private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341, 1346 and 2;

(b) devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to execute the scheme and artifice by transmitting and causing to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343, 1346 and 2;

(c) execute and attempt to execute a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money, funds, and credits owned by and under the custody and control of federally insured financial institutions, in violation of Title 18, United States Code, Sections 1344 and 2;

(d) make and cause others to make materially false, fictitious, and fraudulent representations in a matter within the jurisdiction of the executive branch of the Government of the United States, in violation of Title 18, United States Code, Sections 1001 and 2;

(e) make and cause others to make untrue, false, and misleading statements of material fact in reports and documents required to be filed under the Securities and Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff and Title 17, Code of Federal Regulations, Section 240.13a-1 and 13a-13; and Title 18, United States Code, Section 2;

(f) falsify and cause others to falsify books, records, and accounts of HealthSouth in violation of Title 15, United States Code, Sections 78m(b)(2)(A) & (B), 78m(b)(5) and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-1; and Title 18, United States Code, Section 2;

(g) make and cause others to make material false and misleading statements, and omit to state and cause others to omit to state material facts necessary in order to make the statements made, in light of the circumstances under which the statements were made, not misleading, to HealthSouth's outside auditors in connection with the preparation and filing of documents and reports required to be filed with the SEC, in violation of Title 15, United States Code, Sections 78m(a), 78m(b)(2) and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2; and

(h) use and employ, and cause others to use and employ, a device, scheme, and artifice to defraud, utilizing the means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, in connection with the purchase and sale of HealthSouth's securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## Purpose of the Conspiracy

19. A purpose of the conspiracy was to unjustly enrich and benefit conspirators by fraudulently inflating the results of operations, the financial condition that HealthSouth reported to others, and HealthSouth's stock price.

## Manner and Means of the Conspiracy

20. It was part of the conspiracy that defendant **JAMES P. BENNETT** and other co-conspirator HealthSouth officers and employees would and did participate in a scheme to fraudulently inflate the company's operating results and financial condition, including the net income and earnings per share, that HealthSouth reported to its Board of Directors, employees, the SEC, bond underwriters, market analysts, bankers, the media, and the investing public.

21. It was further part of the conspiracy that, after reviewing reports which showed that HealthSouth's actual financial results had failed to meet quarterly and annual income "guidance" and the consensus of Wall Street analyst expectations, a co-conspirator senior officer would and did cause other co-conspirator senior officers to fraudulently inflate HealthSouth's reported income, operating results, and financial condition.

22. It was further part of the conspiracy that one or more co-conspirator senior officers would and did convey these instructions to members of the corporate accounting staff and discuss

7

with them specific methods for falsifying HealthSouth's books, records, and financial reports in order to fraudulently inflate its reported income, operating results, and financial condition.

23.   It was further part of the conspiracy that co-conspirators, including members of the corporate accounting staff, would and did make and cause to be made, false entries to income statement accounts, including the contractual adjustment accounts, for the purpose of artificially and materially inflating net income and earnings per share on the publicly reported Income Statements.

24.   It was further part of the conspiracy that false and fraudulent entries would be made to HealthSouth's books and records, which added approximately $2.64 billion in fictitious income to the books and records between 1996 and 2002.

25.   It was further part of the conspiracy that once false entries were made to various accounts to increase income, one or more co-conspirators, including members of the corporate accounting staff, in order to "balance" the books, would and did make and cause to be made, corresponding false entries to balance sheet accounts in HealthSouth's books and records, including, but not limited to: (a) Property, Plant and Equipment ("PP&E") accounts; (b) cash accounts; (c) inventory accounts; (d) intangible asset (goodwill) accounts; and (e) suspense accounts.

26.   It was further part of the conspiracy that defendant **JAMES P. BENNETT** and other co-conspirators would and did discuss HealthSouth's actual results of operations and financial performance and the need to falsify those results before they were publicly reported.

27.   It was further part of the conspiracy that defendant **JAMES P. BENNETT** and other co-conspirators would and did periodically receive and compare reports showing the actual results of operations and reports containing the false numbers.

28.   It was further part of the conspiracy that defendant **JAMES P. BENNETT** and other co-conspirators would and did make false representations to, and withhold information from, accountants employed by HealthSouth to audit and examine HealthSouth's financial statements.

29. It was further part of the conspiracy that defendant **JAMES P. BENNETT** and other co-conspirators would and did publicize and disseminate, and cause to be publicized and disseminated, the fraudulently inflated financial information through, among other means, the United States mail and interstate wire communications.

30. It was further part of the conspiracy that defendant **JAMES P. BENNETT** and certain co-conspirators would and did sign, and caused to be filed with the SEC in Washington, D.C., Forms 10-K and other documents which contained materially false and fraudulent information about HealthSouth's income, operating results, financial condition, and earnings per share.

31. It was further part of the conspiracy that defendant **JAMES P. BENNETT** and other co-conspirators would and did cause HealthSouth to issue fraudulently inflated financial reports in order to increase HealthSouth's stock price.

32. It was further part of the conspiracy that defendant **JAMES P. BENNETT** and other co-conspirators would and did cause HealthSouth to issue fraudulently inflated financial reports to induce stock and bond investors, bank lenders, and businesses to invest in HealthSouth's securities and to provide funds and other assets to HealthSouth.

## Overt Acts

In furtherance of the conspiracy and to achieve the objects thereof, the conspirators committed and caused to be committed the following acts, among others, in the Northern District of Alabama and elsewhere:

33. Co-conspirators, including members of the corporate accounting staff, made and caused to be made entries in the books and records of HealthSouth, which caused the following approximate amounts of fictitious income to be included in the annual reports to stockholders and SEC filings for the years 1996 through 2000, the total amount for each year being a separate overt act:

| Year | Amount of Fictitious Income |
|---|---|
| 1996 | $    89.36 million |
| 1997 | $  396.04 million |
| 1998 | $  603.04 million |
| 1999 | $  402.96 million |
| 2000 | $  348.95 million |
| 2001 | $  576.03 million |
| 2002 | $  225.43 million |
| Total | $    2.641  billion |

34.	Co-conspirator corporate accounting staff members added and caused to be added fictitious assets to the books and records of HealthSouth which by December 31, 2002, totaled approximately $2.6 billion, each inclusion being a separate overt act.

35.	Between approximately 1996 and 2000, defendant **JAMES P. BENNETT** and co-conspirator senior officers periodically discussed HealthSouth's actual results of operations and financial performance and the falsification of HealthSouth's financial statements.

36.	Between approximately 1998 and 2000, defendant **JAMES P. BENNETT** received and compared reports showing the actual results of operations and reports containing false numbers.

37.	On March 26, 1999, and March 28, 2000, defendant **JAMES P. BENNETT** signed a letter addressed to HealthSouth's outside auditors in which he represented that he recognized that obtaining representations from management was a significant step for auditors to form an opinion as to whether the consolidated financial statements presented fairly in all material respects the financial position and results of operations of HealthSouth in conformity with generally accepted accounting principles, and in which he falsely represented that there were no material transactions that had not been properly recorded in the accounting records underlying the financial statements, each representation letter signing being a separate overt act.

38.     In or about March of each year from 1997 through 2000, defendant **JAMES P. BENNETT** signed a Form 10-K and caused it to be filed with the SEC, each signing and each filing constituting a separate overt act.

39.     On or about August 14, 1998, defendant **JAMES P. BENNETT** knowingly and willfully caused materially false, fictitious, and fraudulent statements and representations to be made about the amounts reported for net income for certain periods of time and the value of assets at the end of those periods in documents filed with the SEC, namely HealthSouth's Form S-4 in connection with the registration of HealthSouth bonds.

40.     The Grand Jury incorporates herein by reference the allegations set forth in Counts 2 through 34 as overt acts committed by defendant **JAMES P. BENNETT** and other co-conspirators in furtherance of this conspiracy.

All in violation of Title 18, United States Code, Section 371.

**COUNT 2**
**Securities Fraud**
**Title 15, United States Code, Sections 78j(b) and 78ff;**
**Title 17, Code of Federal Regulations, Section 240.10b-5;**
**Title 18, United States Code, Section 2**

1.     The Grand Jury repeats and re-alleges the allegations contained in paragraphs 1 through 17 of Count 1 of this Indictment as though fully set forth herein.

2.     The Grand Jury repeats and re-alleges the allegations contained in paragraphs 19 through 40 of Count 1 of this Indictment by reference as though fully set forth herein.

3.     On or about March 30, 2000, within Jefferson County in the Northern District of Alabama, and elsewhere, defendant

**JAMES P. BENNETT**

and others, by the use of instrumentalities of interstate commerce and the mails, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly (a) employ a device, scheme, and artifice to defraud; (b) make and cause HealthSouth to make untrue statements of material facts and omit to state and cause HealthSouth to omit to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business that operated and would operate as a fraud and deceit upon members of the investing public in connection with purchases and sales of HealthSouth securities; to wit, defendant **JAMES P. BENNETT** and others caused the dissemination of false financial information into the marketplace in the 1999 HealthSouth Form 10-K filed with the SEC on or about March 30, 2000, that materially overstated the operating results and financial condition of HealthSouth by inflating net income and the value of assets at the end of the reporting period.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## COUNT 3
### False Statements to Auditors
### Title 15, United States Code, Sections 78m(a), 78m(b)(2), and 78ff;
### Title 17, Code of Federal Regulations, Section 240.13b2-2;
### Title 18, United States Code, Section 2

1. The Grand Jury repeats and re-alleges the allegations contained in paragraphs 1 through 17 of Count 1 of this Indictment as though fully set forth herein.

2. The Grand Jury repeats and re-alleges the allegations contained in paragraphs 19 through 40 of Count 1 of this Indictment by reference as though fully set forth herein.

3. On or about March 28, 2000, within Jefferson County in the Northern District of Alabama, and elsewhere, defendant

**JAMES P. BENNETT**

and others knowingly and willfully made and caused to be made materially false and misleading statements, and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which the statements were made, not misleading, to accountants of HealthSouth, an issuer of a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, in connection with the audit and examination of the financial statements of HealthSouth as required by law to be made, and the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations enacted by the SEC.

4.	Specifically, while agreeing that he, the Chief Executive Officer, and Chief Financial Officer were responsible for the fair presentation of HealthSouth's consolidated financial statements, defendant **JAMES P. BENNETT**, well-knowing that the representations were untrue, falsely represented to HealthSouth's accountants that, among other things: (a) the consolidated statements of financial position, results of operations, and cash flows were fairly presented; (b) all financial records and related data were made available to HealthSouth's auditors; (c) there was no fraud involving management or employees who have significant roles in internal controls; and (d) there was no fraud involving other employees that could have a material effect on the financial statements.

All in violation of Title 15, United States Code, Sections 78m(a), 78m(b)(2), and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.

## COUNTS 4 - 33
### Insider Trading
### Title 15, United States Code, Sections 78j(b) and 78ff;
### Title 17, Code of Federal Regulations, Section 240.10b-5;
### Title 18, United States Code, Section 2

1.	The Grand Jury repeats and re-alleges the allegations contained in paragraphs 1 through 17 of Count 1 of this Indictment as though fully set forth herein.

2.	The Grand Jury repeats and re-alleges the allegations contained in paragraphs 19 through 40 of Count 1 of this Indictment by reference as though fully set forth herein.

3.	On or about the dates set forth below, each such date constituting a separate count of this Indictment, within Jefferson County in the Northern District of Alabama, and elsewhere, defendant

### JAMES P. BENNETT

knowingly and willfully used and employed manipulative and deceptive devices and contrivances, by use of means and instrumentalities of interstate commerce, the mails, and facilities of a national securities exchange, in violation of Rule 10b-5 of the Federal Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that he engaged in acts, practices, and courses of business which would and

did operate as a fraud and deceit upon members of the investing public in connection with the purchase or sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.  Specifically, while in possession of material non-public information that HealthSouth and its executives and senior officers, including defendant **JAMES P. BENNETT**, had supplied and were continuing to supply materially false and misleading information to the investing public, including but not limited to HealthSouth's publicly reported financial results and public statements of HealthSouth's executives and senior officers, defendant **JAMES P. BENNETT** sold 1,105,000 shares of HealthSouth stock and generated total proceeds of approximately $17,394,054.50.

4. The allegations of paragraphs 1 through 3 above are re-alleged for each of Counts 4 through 33 below as though fully set forth therein.

| COUNT | DATE | SHARES | PROCEEDS |
|---|---|---|---|
| 4 | 12/19/00 | 15,000 | $223,125 |
| 5 | 12/20/00 | 70,000 | $1,058,437.50 |
| 6 | 12/21/00 | 10,000 | $152,500 |
| 7 | 12/26/00 | 45,000 | $693,437.50 |
| 8 | 12/27/00 | 135,000 | $2,176,562.50 |
| 9 | 12/28/00 | 150,000 | $2,515,937.50 |
| 10 | 12/29/00 | 90,000 | $1,544,375 |
| 11 | 1/3/01 | 75,000 | $1,151,013 |
| 12 | 1/10/01 | 30,000 | $451,250 |
| 13 | 1/11/01 | 40,000 | $634,375 |
| 14 | 1/12/01 | 20,000 | $313,125 |
| 15 | 1/16/01 | 30,000 | $470,312.50 |
| 16 | 1/17/01 | 25,000 | $397,187.50 |
| 17 | 1/18/01 | 5,000 | $78,125 |
| 18 | 1/22/01 | 10,000 | $151,250 |

| COUNT | DATE | SHARES | PROCEEDS |
|---|---|---|---|
| 19 | 1/23/01 | 10,000 | $154,062.50 |
| 20 | 1/24/01 | 40,000 | $633,750 |
| 21 | 1/29/01 | 50,000 | $802,300 |
| 22 | 2/2/01 | 5,000 | $76,252 |
| 23 | 2/5/01 | 20,000 | $310,650 |
| 24 | 2/6/01 | 20,000 | $320,074 |
| 25 | 2/7/01 | 20,000 | $319,602 |
| 26 | 2/8/01 | 25,000 | $405,250 |
| 27 | 2/12/01 | 18,300 | $299,750 |
| 28 | 2/13/01 | 11,700 | $191,050 |
| 29 | 2/14/01 | 5,000 | $81,200 |
| 30 | 2/20/01 | 10,000 | $160,000 |
| 31 | 4/25/01 | 105,000 | $1,385,351 |
| 32 | 6/29/01 | 10,000 | $161,250 |
| 33 | 7/9/01 | 5,000 | $82,500 |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## COUNT 34
### False Statement
### Title 18, United States Code, Section 1001

1. The Grand Jury repeats and re-alleges the allegations contained in paragraphs 1 through 17 of Count 1 of this Indictment as though fully set forth herein.

2. The Grand Jury repeats and re-alleges the allegations contained in paragraphs 19 through 40 of Count 1 of this Indictment by reference as though fully set forth herein.

3. In or about February 2003, the United States Department of Justice, a department of the executive branch of the government of the United States, through the Federal Bureau of Investigation, was conducting an investigation of alleged wrongdoing by HealthSouth employees.

4.     On or about February 26, 2003, within Jefferson County in the Northern District of Alabama and elsewhere, defendant

**JAMES P. BENNETT**

did knowingly and willfully make and cause to be made a materially false representation in a matter within the jurisdiction of the executive branch of the government of the United States; that is, the defendant **JAMES P. BENNETT** told agents of the Federal Bureau of Investigation that while he was employed at HealthSouth the company never manipulated the stock price; whereas, in truth and in fact, as the defendant then and there well knew and believed, HealthSouth's financial statements, which were publicly disseminated, had been falsified by certain HealthSouth officers and employees while the defendant worked there in order to artificially inflate the stock price.

All in violation of Title 18, United States Code, Section 1001.

### COUNTS 35 - 36
### Money Laundering
### Title 18, United States Code, Sections 1957 and 2

1.     The Grand Jury repeats and re-alleges the allegations contained in paragraphs 1 through 17 of Count 1 of this Indictment as though fully set forth herein.

2.     The Grand Jury repeats and re-alleges the allegations contained in paragraphs 19 through 40 of Count 1 of this Indictment by reference as though fully set forth herein.

3.   On or about the dates set forth below, each such date constituting a separate count of this Indictment, within Jefferson County in the Northern District of Alabama and elsewhere, the defendant

**JAMES P. BENNETT**

did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000.00, that is the transfer of funds in the amounts listed below, such property having been derived from specified unlawful activities, that is, a scheme and artifice to defraud stockholders, bondholders, potential stockholders, bond underwriters, HealthSouth, and other persons and entities, in violation of Title 18, United States Code, Sections 371, 1341, 1343, 1344,

and 1346, and Title15, United States Code, Section 78f as alleged in Counts One through Thirty-Three of this indictment.

    4. The allegations of paragraphs 1 through 3 above are re-alleged for each count of Counts 35 and 36 below as though fully set forth therein.

| Count | Date | Amount | Method of Transfer | Purpose |
|---|---|---|---|---|
| 35 | March 1, 2001 | $6,000,000.00 | Check | Creation of investment accounts |
| 36 | April 5, 2001 | $59,650.00 | Check | Purchase of 2001 Formula 260 Bowrider boat |

All in violation of Title 18, United States Code, Sections 1957 and 2.

### COUNT 37
### Criminal Forfeiture
### Title 18, United States Code, Section 981(a)(1)(C)
### and Title 28, United States Code, Section 2461(c)

    1. Counts One through Thirty-Three of this Indictment are incorporated by reference herein for the purpose of alleging criminal forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

### Forfeiture

    2. As a result of the foregoing offenses alleged in Counts One through Thirty-Three of this Indictment, defendant

**JAMES P. BENNETT**

shall forfeit to the United States any property constituting or derived from proceeds traceable to said violations. Such forfeitable interests include, but are not limited to the aggregate sum of $28,133,065.50 and all interest and proceeds derived therefrom.

    If any of the property described above as being subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and 28 United States Code, Section 2461(c), as a result of any act or omission of defendant **JAMES P. BENNETT**–

    (1) cannot be located upon the exercise of due diligence;

(2) has been transferred to, sold to, or deposited with a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of defendant **JAMES P. BENNETT**, up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

### COUNTS 38 - 39
### Criminal Forfeiture
### Title 18, United States Code, Section 982(a)(1)

1. Counts One through Thirty-Three and Thirty-Five through Thirty-Six of this Indictment are incorporated by reference herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(1).

### Forfeiture

2. As a result of the foregoing offenses alleged in Counts Thirty-Five and Thirty-Six of this Indictment, as identified below, defendant

### JAMES P. BENNETT

shall forfeit to the United States any property, real and personal, involved in such offenses, or any property traceable to such property; to-wit:

| Count | Property Involved in Offense, or Traceable to Offense | Offense |
|---|---|---|
| 38 | The sum of $6,000,000.00 | Count 35 |
| 39 | One (1) 2001 Formula 260 BR boat | Count 36 |

If any of the property described above in Counts 38-39 as being subject to forfeiture pursuant to Title 18, United States Code, Section 982, as a result of any act or omission of defendant **JAMES P. BENNETT** –

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred to, sold to, or deposited with a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of defendant **JAMES P. BENNETT** up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Section 982.

A TRUE BILL._____

_____
Foreperson

_____   _____
ALICE H. MARTIN                                          RICHARD C. SMITH
United States Attorney                               Principal Deputy Chief for Litigation
Northern District of Alabama                 Criminal Division/Fraud Section
                                                                      United States Department of Justice


_____   _____
GEORGE A. MARTIN, JR.                         J. PATTON MEADOWS
Assistant United States Attorney             Assistant United States Attorney
Northern District of Alabama                 Northern District of Alabama


_____
JAMES D. INGRAM
Assistant United States Attorney
Northern District of Alabama